UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

FRIENDS OF ANIMALS, and
PROTECT MUSTANGS,

    Plaintiffs,

v.

THE UNITED STATES BUREAU OF LAND
MANAGEMENT, an agency of the United
States,

    Defendant.

3:15-CV-0057-LRH-WGC

ORDER

    Before the court is plaintiffs Friends of Animals and Protect Mustangs' (collectively "plaintiffs") motion for a preliminary injunction. Doc. #8.[1] Defendant the United States Bureau of Land Management ("BLM") filed an opposition to the motion (Doc. #13) to which plaintiffs replied (Doc. #15).

## I.  Facts and Background

    Plaintiffs move for a preliminary injunction to enjoin the BLM from implementing its December 19, 2014 decision to gather and remove 332 wild horses from the Pine Nut Herd Management Area ("Pine Nut HMA"), permanently removing 200 of them, and administering the fertility control drug porcine zone pellucide ("PZP") to all mares one-year and older in the remaining 132 horses before they are released back into the Pine Nut HMA.

---

[1] Refers to the court's docketing number.

The Pine Nut HMA covers approximately 98,000 acres of land located in Carson, Lyon, and Douglas counties. The BLM previously determined that the appropriate herd management level ("APL") for the Pine Nut herd is between 119-179 horses.[2] In 2010, the BLM found that the Pine Nut herd had grown to approximately 215 horses. At that time, the BLM proposed a roundup of approximately 199 horses of which 67 were to be removed permanently, while 45 mares were to be dosed with PZP and then released back into the Pine Nut HMA with the remaining horses. Concurrently with the 2010 proposal, the BLM conducted an 80-plus page environmental assessment pursuant to the National Environmental Policy Act ("NEPA"), which examined the environmental impacts associated with wild horse management activities within multiple herd management areas under the jurisdiction of BLM's Carson City office ("2010 EA").[3] This initial Pine Nut roundup was completed at the projected level by the BLM in November 2010.

On December 19, 2014, the BLM announced its plan for the current gather and PZP dosing of wild horses in the Pine Nut HMA. See Doc. #8, Exhibit E, Pine Nut Wild Horse Gather Decision Record. The proposed roundup is expected to last ten (10) days beginning on February 17, 2015, so that the gather will be finished before sage grouse breeding season which generally starts on March 1st of each year. The BLM reached its gather decision based upon its estimate that the Pine Nut HMA currently contains approximately 332 wild horses, an amount well above the 119-179 APL. In contrast to the 2010 gather, the BLM's December 19, 2014 gather decision was not accompanied by any environmental assessment. Instead, the BLM relied on the 2010 EA and prepared a Determination of NEPA Adequacy ("DNA") to support its decision.[4] In the DNA, the BLM

---

[2] The plaintiffs do not challenge the BLM's APL finding in this action and there is no evidence before the court that the Pine Nut HMA can sustainably support a larger number of wild horses.

[3] A complete copy of the Final Environmental Assessment: Clan Alpine, Pilot Mountain and Pine Nut Herd Management Areas Gather Plan is attached as Attachment C to plaintiffs' motion for a preliminary injunction. *See* Doc. #8, Attachment C.

[4] A copy of the BLM's Determination of NEPA Adequacy is attached as Attachment D to plaintiffs' motion for a preliminary injunction. *See* Doc. #8, Attachment D.

determined that the proposed gather plan was the same as the gather plan described in the 2010 EA as it related to the Pine Nut HMA, and thus, no new or supplemental NEPA analysis (either through an EA or an Environmental Impact Statement ("EIS")) was required.

On January 26, 2015, and in response to the BLM's December 19, 2014 gather decision, plaintiffs filed a complaint for declaratory and injunctive relief against BLM alleging two causes of action: (1) violation of the Administrative Procedures Act ("APA"); and (2) violation of NEPA. Doc. #1. Thereafter, on January 29, 2015, plaintiffs filed the present motion for a preliminary injunction. Doc. #8. The court held a hearing on plaintiffs' motion on Monday, February 9, 2015. This order follows that hearing.

**II.     Legal Standard**

    **A.  Preliminary Injunction Standard**

A court may grant a preliminary injunction upon a showing of: (1) irreparable harm to the petitioning party; (2) the balance of equities weighs in petitioner's favor; (3) an injunction is in the public's interest; and (4) the likelihood of petitioner's success on the merits. *See Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008) (citations omitted). In *Winter*, the Supreme Court stated that a "likelihood" is required as to all four factors. *See* 555 U.S. at 22. The Ninth Circuit has since interpreted the *Winter* decision as being compatible with a sliding scale, under which a party may satisfy the requirements for an injunction with a lower showing under one factor if there is a very strong showing under another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under the sliding scale approach, the Ninth Circuit has determined that "serious questions" as to the merits would satisfy the "likelihood of success" requirement in the event of a strong showing of irreparable harm. *Id.*

    **B.  Administrative Procedures Act**

All of the claims in this case are governed by the Administrative Procedures Act, 5 U.S.C. §§ 701-706. Under the APA, a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

3

1  not in accordance with law." 5 U.S.C. § 706(2)(A); *Or. Natural Res. Council Fund v. Brong*, 492
2  F.3d 1120, 1124-25 (9th Cir. 2007).
3      Review under the arbitrary and capricious standard is narrow, and the court must not
4  substitute its own judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987
5  (9th Cir. 2008), overruling in part on other grounds recognized by *Friends of the Wild Swan v.*
6  *Weber*, 767 F.3d 936, 949 (9th Cir. 2014). Nonetheless, the court must engage in a substantial
7  inquiry of the agency's action. *Brong*, 492 F.3d at 1125. To meet its burden under this standard, an
8  agency must present a "rational connection between the facts found and the conclusions made." *Id*.
9  An agency's decision is arbitrary and capricious if it was not "based on a consideration of the
10 relevant factors" or if there was a "clear error of judgment." *Citizens to Preserve Overton Park, Inc.*
11 *v. Volpe*, 401 U.S. 402, 416 (1971).

12 **III.  Discussion**

13     **A.  Likelihood of Success on the Merits**

14     The *sine qua non* of preliminary injunction inquiry is likelihood of success on the merits: "if
15 the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors
16 become matters of idle curiosity." *New Comm Wireless Services, Inc. v. SprintCom, Inc.*,
17 287 F.3d 1, 9 (1st Cir. 2002). However, a plaintiff may be awarded a preliminary injunction by
18 establishing "that serious questions going to the merits were raised and the balance of hardships
19 tips sharply in the plaintiff's favor" so long as the plaintiff satisfies the additional *Winter* factors
20 including irreparable harm and that a preliminary injunction is in the public's interest. *Alliance for*
21 *Wild Rockies*, 632 F.3d at 1131.

22     In their motion for a preliminary injunction, plaintiffs argue that they are likely to succeed
23 on the merits of their complaint on the basis that the BLM violated NEPA by authorizing the
24 currently proposed gather in the Pine Nut HMA without conducting a new or supplemental EA. *See*
25 Doc. #8. The court agrees.
26 ///

The role of the courts with respect to NEPA is to ensure that an agency has adequately considered the environmental consequence of its action. *Balt. Gas & Electric Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983). NEPA does not require that agency officials be impartial, only that they objectively evaluate the proposed projects. *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

Here, it is undisputed that the BLM did not prepare a separate EA before their December 19, 2014 decision to gather horses in the Pine Nut HMA. Rather, the BLM issued a DNA that relies upon the 2010 EA and the 2010 Finding of No Significant Impact ("FONSI") to support their gather decision. In their DNA, the BLM notes that the present herd of 332 horses is well above the APL for that area and that the large number of excess horses is having a negative effect on certain grazing areas, causing a loss of other wildlife habitat, and is harming the herd itself. The court is aware of the dangerous conditions in the Pine Nut HMA and elsewhere throughout Nevada caused by long drought conditions and larger than sustainable herd sizes. And it is these dangers that have caused the BLM to seek permanent removal of 200 wild horses from the Pine Nut HMA as well as fertility dosing of returning females.

These considerations being noted, however, the BLM made its roundup decision without conducting an adequate analysis under NEPA. The court finds an insufficient legal basis for the BLM to rely upon the 2010 EA and 2010 FONSI to support its current roundup decision.

Initially, it was never the expressed intention of BLM to rely upon the 2010 EA to support further roundups likely to occur four and five years later. In its introduction relative to the purpose and need for the proposed 2010 plan, the BLM outlined its proposal to conduct gathers in the three HMAs, to treat mares with a two-year fertility control vaccine and "to return to these HMAs in 2-3 years, if necessary, to gather and retreat the mares to maintain the appropriate management levels through fertility control measures." There was no expressed intention by BLM to have its 2010 EA extend beyond that time and there was no suggestion that the 2010 EA met requirements beyond 2013. Moreover, in its responses to consolidated public comments concerning the 2010 EA, the

BLM responded:

> Although BLM currently intends to return to the areas in 2-3 years in order to maintain the population control protocols by gathering and retreating the mares, future gathers will be subject to a separate NEPA analysis and decision making process.

(2010 EA at page 72.)

Insofar as the Pine Nut HMA was concerned, the 2010 EA was also far narrower in scope than the current proposed roundup. In the 2010 EA, the BLM analyzed the gathering of 199 horses from the Pine Nut HMA with the permanent removal of 67 horses. In fact, the 2010 gather was completed in November 2010 in conformance with the BLM's proposal and 46 horses were permanently removed. In comparison, the current plan proposes to gather 332 horses and to permanently remove 200 of them. This proposed roundup far exceeds the intensity and scope of what was proposed under the 2010 EA. Thus, the 2010 Pine Nut roundup was not contemplated or considered as justification for other or greater roundups in subsequent years.

The court therefore concludes that the 2010 EA was not intended to serve as a viable NEPA analysis of a roundup of such a greater intensity and scope as the proposed 2015 roundup. Therefore, the court finds that plaintiffs have established that they are likely to proceed on their claim of a NEPA violation by the BLM.

**B. Irreparable Harm**

A plaintiff must show that an irreparable injury is likely, not merely possible, before a temporary restraining order may be issued. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (reversed on other grounds *Am. Trucking Ass'ns v City of Los Angeles*, 596 F.3d 602 (9th Cir. 2010)) (emphasis added). "Issuing an [injunction] based only on a possibility of irreparable harm is . . . an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct. at 375-76.

In this case, plaintiffs have established that there is a likelihood that if BLM implements its roundup, it will cause significant and irreparable harm to plaintiffs and their members. For example, plaintiffs have proffered several affidavits establishing that the roundup will cause

plaintiffs to lose their positive personal connection with the wild horses in the Pine Nut HMA. *See* Doc. #8, Exhibit 1, Affidavit of Ms. Anne Novak; Exhibit 2, Affidavit of Mr. Craig Downer; Exhibit 4, Affidavit of Ms. Nicole Rivard. The proffered affidavits establish that plaintiffs and their members have visited, photographed, filmed, studied, and written about the Pine Nut herd in recent years and desire to do so in the future. The removal of 200 of these horses will adversely affect plaintiffs' connection with this herd. Therefore, the court finds that plaintiffs have established a likelihood of irreparable harm absent an injunction.

### C. Balance of Equities

In seeking a preliminary injunction, a plaintiff must demonstrate that his claim presents a serious question of law and that the current litigation has merit so as to avoid undue harm to the defendant. *See Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993). Additionally, the plaintiff must suffer a degree of hardship that outweighs the hardship placed upon the defendants by the injunction. *Id.* Further, the primary goal of a preliminary injunction is simply to preserve the status quo until a trial on the merits can occur. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

The court has reviewed the balance of equities and finds that the equities support an injunction. Although the BLM will be unable to gather the excess wild horses prior to the start of sage grouse breeding season, this delay will only last until the court has an opportunity to resolve the case on the merits, or until the BLM prepares an appropriate EA analyzing the proposed gather. Indeed, the BLM prepared an EA before conducting the 2010 gather in the Pine Nut HMA, and there is no reason it cannot prepare the required NEPA documentation in this case. Thus, the delay caused by the injunction is not enough to offset the BLM's failure to comply with NEPA requirements.

### D. Public's Interest

Before granting an injunction the court must determine that an injunction is in the public's interest. *Winter*, 129 S. Ct. at 375-76.

Throughout the Wild Free-Roaming Horses and Burros Act, found at 16 U.S.C. §§ 1331 *et seq.*, Congress recognized that the public has a strong interest in maintaining a healthy and viable wild horse population for future use and enjoyment. Similarly, there is a substantial public interest in having government agencies comply with federal mandates and laws. *See Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998) (holding that "the public has a general interest in the meticulous compliance with the law by public officials.").

With the proposed Pine Nut roundup, the BLM is attempting to follow the policy of Congress that wild horses are to be protected at sustainable levels; however, it also appears to have failed to satisfy NEPA and other federal laws which are applicable. Accordingly, the court finds that the public interest will be best served by enjoining the BLM's proposed gather, at least until the court has an opportunity to fully consider the merits of plaintiffs' claims.

IT IS THEREFORE ORDERED that plaintiffs' motion for a preliminary injunction (Doc. #8) is GRANTED.

IT IS SO ORDERED.

DATED this 11th day of February, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE